## GOODWYNNE *et al. v.* BELLERBY.

1. Where an administrator obtains an order from the ordinary to sell lands of his intestate, and at the sale a person buys and gives his note for the purchase-money, and, after his failure to pay the note at maturity, the administrator brings suit thereon but dies pending the suit, and an administrator de bonis non is appointed and made a party to the suit and obtains judgment therein, such administrator de bonis non has power and authority, when the judgment is satisfied, to make a deed to the lands without any further order from the ordinary or any other court. The prosecution of such a suit and collecting the judgment therein is a partial administration of the assets of the estate of the intestate.

2. The delivery of the deed to the land and its acceptance by the purchaser sufficiently appears, relatively at least to the rights of one from whom the purchaser has borrowed money, when it is shown that the deed was recorded; that the purchaser applied for a loan of money and offered to secure it by a deed to the land, stating that he had acquired it by purchase and had fully paid for it; that this application was, by the agents of the purchaser sent to the lender with an abstract of title attached showing the execution and record of this deed; that the loan was made on the faith of the application and abstract and the money accepted by the purchaser; and that the recording fee was paid out of the money loaned.

3. A general judgment obtained by the administrator de bonis non against the purchaser for a certain sum of money, which had been satisfied long prior to the execution of the deed by the purchaser as security for a loan, was no notice to the lender that the purchaser's children had any interest in the land. Even if it had been the duty of the lender to examine the pleadings and the verdict upon which the judgment was rendered, they were not sufficient to constitute notice that the children had any interest in the land now in dispute.

4. The evidence is conclusive that the lender was an innocent purchaser without notice, and the brokers who obtained the loan were, under the law and the evidence, the agents of the borrower and not of the lender; consequently notice to them of the secret equity of the children was not notice to the lender.

5. Where minor children reside with their father who is in possession of land to which he has the legal title, the children's residence on the land is not sufficient to put a purchaser from the father upon notice or inquiry as to any secret equity they may have therein. When they become of age and leave the premises and reside for several years upon other lands, and, a few days before the execution of the deed by the father, one of them returns to the land, claims a right therein, and moves upon the land, the father continuing in possession and apparent control, such residence is not notice of the equity of the children.

6. The plaintiffs in error having no interest in the land as against the defendant in error, but being in possession of the land, making crops thereon, and being insolvent, there was no error in appointing a receiver.

7. There being a strong equity in the petition and equity having assumed jurisdiction, the court may enjoin the trial of a claim case between the same parties and relating to the same land, so that the whole controversy may be tried in one proceeding in the court of equity. Equity, when it assumes jurisdiction, will not parcel out the case but will retain it for complete determination.

8. Under the facts disclosed by the record, there was no error in refusing to allow the defendants to give a damage bond to the plaintiff in lieu of the appointment of a receiver.

Argued December 16, 1902, — Decided January 9, 1903.

Petition for injunction, etc. Before Judge Reagan. Monroe superior court. October 22, 1902.

*Hardeman, Davis, Turner & Jones* and *Persons & Persons,* for plaintiffs in error.

*Hall & Wimberly* and *Cabaniss & Willingham,* contra.

SIMMONS, C. J. In the year 1872 John B. Ogletree, of the county of Monroe, died intestate. David B. Ogletree was appointed his administrator. He obtained an order from the court of ordinary, in 1873, to sell the property of his intestate, both real and personal. At the sale C. O. Goodwynne became the purchaser of certain land. Apparently this land was sold upon credit, as Goodwynne gave his note for the purchase-money. This note was not paid at maturity, and the administrator brought a suit thereon in the superior court of Monroe county. Goodwynne filed a petition in equity to enjoin the action against him by the administrator. He alleged that he had married a daughter of John B. Ogletree, and that she was one of the distributees of his estate; that the administrator was on this account indebted to her in a sum much larger than the amount of the note sued on; and that for that reason the administrator should not be allowed to recover against petitioner

when the estate owed his wife, the land having been purchased on account of the fact that his wife was a distributee of the estate. Goodwynne's wife died, and he was appointed guardian of his four minor children. He filed an amendment to his petition, in which he alleged that he had purchased the land for the use of himself and his minor children, and prayed that his and their distributive shares be credited on the note. He made the other distributees parties, and prayed that an accounting and settlement be had with them all. The administrator filed an answer to this petition, but died before the trial. Sharp was appointed administrator de bonis non, and made party plaintiff to the common-law suit and party defendant in the equitable proceeding. On the trial of these cases the jury allowed Goodwynne credit on the note of certain sums due as a distributive share of the estate of John B. Ogletree, and a one-sixth part of certain sums in the hands of the administrator de bonis non. The verdict also found against Goodwynne for a certain amount, and found that he was entitled to a one-sixth interest in certain notes and accounts in the hands of the administrator de bonis non. Upon this verdict a general judgment for $4,599.43 was entered up against Goodwynne in favor of Sharp, administrator de bonis non. In 1876 this verdict and judgment were recorded on the minutes of the court. The judgment was paid off by Goodwynne, or settled out of the moneys received from the estate; the record is silent which. No deed was made to Goodwynne for several years, when, on the request of an attorney, Sharp after some hesitation executed a deed to Goodwynne. This deed was placed on record in 1885. Subsequently Goodwynne obtained a loan of $5,000 from James H. Tallman, giving as security a mortgage upon the land purchased by him at the administrator's sale. Being unable to pay this loan at maturity, Goodwynne took up and canceled the mortgage given to Tallman by borrowing $5,000 from Bellerby, the defendant in error in the present case, giving Bellerby a security deed to the land to secure the payment of the loan. This latter loan having become due under its terms, Bellerby commenced his action against Goodwynne to recover a judgment for the amount of the loan with interest, and prayed a special lien on the land described in the deed. After long litigation, Bellerby obtained a general judgment against Goodwynne for the amount sued for, with a special lien upon the land. Execution was issued and levied

upon the land, and the children of Goodwynne filed a claim to the land, setting up at first that a one-half interest in the land belonged to them as heirs of their mother's inherited portion of their grandfather's estate. At the hearing this claim was amended by setting up that they claimed a one-half interest in the land by reason of the fact that money which belonged to them, coming from their grandfather's estate, had been used to pay for the land, and that their claim was superior to that of Bellerby. Upon the filing of this amendment the case was continued, and before the next term of court Bellerby filed an equitable petition praying for a receiver and for an injunction against the claimants, on the ground that they were trespassers and had no interest in the land superior to his judgment, that the land was going to waste and depreciating in value, that they were making crops on it and selling them, and that they were insolvent. The claimants, the defendants in this petition, answered, and both sides submitted many affidavits and certain documentary evidence. After a full hearing the court granted the injunction and appointed a receiver. The defendants excepted.

1. The first exception made is as to the admissibility of the deed made by Sharp, the administrator de bonis non, to Goodwynne. The plaintiffs in error contended that Sharp had no power or authority, as administrator de bonis non, to execute this deed, and that it was therefore void and gave no title to Goodwynne, under whom Bellerby claims. The theory of this position is that when David B. Ogletree, the first administrator, sold the land, it was thereby fully administered, and when he took a note for the purchase-money such note was due to him personally and not as administrator; that the land having been administered by the first administrator, and the administrator de bonis non having power only to administer the unadministered assets, the administrator de bonis non had no power to execute a deed to this land. To sustain this contention the cases of *Thomas* v. *Hardwick*, 1 *Ga.* 80, and *Oglesby* v. *Gilmore*, 5 *Ga.* 56, were relied upon. These cases were decided upon questions arising before the passage of the act of 1845 and the adoption of the code, and were based upon what the court then thought was the common law. Since these decisions the code has made quite an innovation with regard to the rights and powers of administrators de bonis non. Under the common law, if an admin-

istrator commenced an action and died, his successor could not be made a party to the action, but it abated. So an administrator de bonis non could not call his predecessor to an accounting for a devastavit. All this has been changed in this State by the code. The administrator de bonis non may be made a party and continue a suit commenced by his predecessor, as was done in this case. He can also call his predecessor to an accounting for a devastavit. The true law is, and has been for a great many years, that if the assets are such that the money recovered would belong to the estate, then the administrator may sue thereon in his representative capacity, and in case of his death or removal the right to collect the assets would go to the administrator de bonis non. Sheets v. Pabody, 5 Blackf. 120, 38 Am. Dec. 132; King v. Green, 2 Stewart, 133, 19 Am. Dec. 46; 2 Wms. Exrs. (7th. Am. ed.) t. p. 80; 11 Am. & Eng. Enc. L. (2d. ed.) 1329. David B. Ogletree as administrator had, therefore, a right to bring his action against Goodwynne on the purchase-money note, for the money recovered would have been assets in his hands belonging to the estate. When he died and the administrator de bonis non was made a party to the suit and obtained a money judgment, the money so recovered was assets in his hands. The former administrator having died before judgment, the purchase-money note represented assets to be administered by the administrator de bonis non. This was recognized by Goodwynne when he filed his equitable petition against Ogletree, the first administrator; for if the administrator's simple sale had administered the land and the suit on the note was Ogletree's individual suit, Goodwynne's petition could not have been maintained nor would he have been entitled to the relief prayed. The plaintiffs in error also recognized it by insisting that the verdict and decree or judgment in that case established their rights in the land. They can not now claim this, and at the same time say that the suit commenced by Ogletree was his individual suit and that he had fully administered the land when he sold it. In our opinion, knocking down the land to Goodwynne as the highest and best bidder and taking his note therefor did not complete the sale. The code (Civil Code, § 3447) allowed the administrator, under certain restrictions, to sell the land on credit if he deemed best to do so. He did this without making a deed to the purchaser, and the title did not pass from the estate to Goodwynne until after the purchase-money had

been paid. This being so, under the great weight of authority the administrator de bonis non had the right and power, upon the satisfaction of the judgment against Goodwynne for the purchasemoney, to make him a deed to the land. There is only one case relied on by plaintiffs in error to the contrary. Davis *v.* Brandon, 1 How. (Miss.) 154. While that case holds that an administrator de bonis non has no right to make a deed to land sold by his predecessor, the decision was really put upon the ground that the paper executed by the administrator de bonis non was in fact no deed. Mr. Freeman, in his work on Void Judicial Sales, § 46, citing this case, says: "In Mississippi an administrator de bonis non can not execute a conveyance where the sale was made by his predecessor in office. But we judge the better rule to be, that such an administrator may complete whatever the first administrator ought to have done."

Sharp, the administrator de bonis non, having administered the assets of the estate arising from the sale of the land, had power to make the deed without any order from the court of ordinary or any other court, his predecessor having before his death obtained the requisite order authorizing the sale. The administrator de bonis non stood, as to this matter, in the shoes of his predecessor and could do whatever he could have done to complete the administration of the assets of the estate. See 11 Am. & Eng. Enc. L. (2d ed.) 1155, and the views of Caton, C. J., in Baker *v.* Bradsby, 23 Ill. 632, and of Safford, J., in Gridley *v.* Phillips, 5 Kans. 349.

2. Another exception was based on the contention that this deed had never been delivered by Sharp to Goodwynne, the grantee. Various affidavits were introduced in evidence upon this question, those on the one side tending to show that Goodwynne's agent had the deed recorded in order to perfect the chain of title into Goodwynne when he wished to borrow money on the faith of this land; and those on the other that the deed had never been accepted by Goodwynne. Goodwynne himself testified positively that he did not know of the existence of the deed until after the commencement of the suit by Bellerby against him. To our minds, however, the record in this case shows conclusively that Goodwynne employed certain brokers to obtain the loan for him, and gave them authority to examine the title to the land at his expense and execute all necessary papers; that they had an abstract of title made,

and in it this identical deed was given, together with the date of its record; that this abstract was forwarded through his brokers, together with an application for loan signed by Goodwynne, in which it was stated that he had title to this land, which he offered to convey as security for the loan, that he had bought it in 1873 and had paid for it, and that it was free from liens except the mortgage given to Tallman; and that on the faith of these statements and of the abstract the loan was procured for Goodwynne, who received the money. It also appears that the recording fee was deducted from the money loaned, before it was paid over to Goodwynne. These facts, we think, show a knowledge of the deed by Goodwynne and a recognition by him of its existence and record. The record itself is prima facie evidence of a delivery of the deed, and, taken in connection with the other facts in evidence, clearly shows that while the deed may never have been handed to Goodwynne in person, he nevertheless knew of its existence and record and took advantage of this in obtaining money from Bellerby. Goodwynne at no time appears to have disputed the delivery and existence of the deed until, after he had been defeated in his litigation with Bellerby, the present plaintiffs in error, Goodwynne's children, sought to establish a claim to an interest in the land. Bellerby acted on the faith of the record of the deed and Goodwynne's representations in regard to it. We think that, in so far at least as Bellerby's rights are concerned, the facts recited are sufficient to show a delivery of the deed to the grantee.

3. It was contended by counsel for the plaintiffs in error that Bellerby was not a bona fide purchaser without notice, because the pleadings in the suit filed by Goodwynne against Ogletree, the first administrator, and the verdict and judgment therein, were constructive notice to the world that Goodwynne's children had an interest in the land. As before remarked, the judgment rendered in that case was merely a general judgment for a named sum of money, against Goodwynne and in favor of the administrator de bonis non, and had been satisfied long prior to the date of the loan and the deed to secure it. One who had looked at the judgment would have received no notice or intimation that the children had any right or interest in the land. It was merely a general judgment against Goodwynne himself, and could be notice of no claim of his children. The case had been ended and the judgment satisfied years

before Bellerby acquired any rights in the property. Under these facts the doctrine of lis pendens could not apply. But even conceding that Bellerby should have looked to the pleadings and the verdict, as well as the judgment, these would have conveyed no notice to him. Goodwynne had been sued upon a promissory note, and he sought to enjoin the suit upon the ground that his wife was one of the distributees of the estate, and asked that her distributive share should be credited on his note. Upon her death he was made guardian of his children, but did not have himself made a party to this suit in that capacity. He simply by amendment alleged that he was their guardian, and asked that he be accounted with for their distributive shares. He continued to litigate as an individual. Certain credits were allowed by the jury, and perhaps they were paid to him as guardian. If so, he and his sureties are liable to account for the money so paid. His petition did not claim that the children had any interest in the land, except that it was alleged that he had purchased the land for the use of himself and his children; and it must be borne in mind that at the time of the purchase his wife was living, and his children could not possibly have had any such pecuniary interest as is now claimed for them. The petition did not pray that the credits allowed should be a lien upon the land, or that the children should have any title or interest decreed to be in them. The verdict conformed to his prayers, and allowed him, as an individual, credits for certain sums as distributive shares of the estate of John B. Ogletree. It did not appear from this verdict to whom these distributive shares belonged, or that they were accorded to any one other than Goodwynne. One could not gather from these pleadings that the children had any interest in the land, but would rather conclude that the payments allowed went to Goodwynne individually and as guardian for his children, and that as guardian he was liable to the children for such of their money as was applied to the payment of his note. Further than this, the pleadings do not identify any particular land, nor is any land mentioned in the verdict and judgment. The pleadings refer to certain lands, but do not give such a description as would locate or identify them. We conclude, therefore, indeed we are quite certain, that if Bellerby had looked to the pleadings, verdict, and judgment in the case, there was nothing in them to put him upon notice that the children of Goodwynne had or claimed any interest in the land now in dispute.

4. Another contention of counsel for the plaintiffs in error was that Bellerby was not an innocent purchaser without notice, because his agents had notice and knowledge of the equity of the plaintiffs in error, prior to the time of the execution of the deed to him.   We have carefully read every word of this voluminous record, and there is not a scintilla of evidence or even a suspicion that Bellerby had any notice of the equity of the children when he made the loan to their father.   This contention is based on the claim that the agents who procured the loan were the agents of Bellerby, the lender; but in our opinion there is nothing in the evidence to sustain this claim.   The application of the borrower appointed these brokers his agents to procure the loan.   That application authorized them to examine the land and the improvements thereon, and to investigate the title, that they might have a basis on which to secure the loan.   Under this authority one of the brokers had an abstract made by a competent attorney, that abstract containing a description of the land and setting out Goodwynne's chain of title.   These brokers took the application and the abstract and sent them to their brokers in Connecticut.   These latter sent them to Bellerby, and upon the faith of these papers he made the loan and took the deed as security.   According to the evidence the brokers in Georgia did not know Bellerby and had not heard of him until after he had agreed to advance the money on this loan. They had no communication with him, but acted, in negotiating and procuring the loan, as the agents of Goodwynne.   It is true that Goodwynne deposes in his affidavit that Anderson, the local agent, had never been appointed as his agent to have an abstract of the title made, and that deponent had no knowledge that one had been prepared until after the commencement of the suit against him.   But his application appointed Lawton & Smith his agents and authorized them to examine the title.   Of course, in negotiating the loan on the security of the land, an abstract of the title had to be furnished for the inspection of the lender.   But at any rate the brokers can not be said to have been agents of the lender. This court has frequently held that, under such a state of facts, the broker is the agent of the borrower and not of the lender. If, therefore, it is true that Anderson and Lawton & Smith had any notice of the contents of Goodwynne's petition against Ogletree and the verdict and judgment thereon, this was notice to Goodwynne's

agents, and not to Bellerby's. Even, however, had they been Bellerby's agents, we think we have shown above that a knowledge of the petition, verdict, and judgment would not have put them on notice of the children's equity in this land.

5. It was further contended that Bellerby had notice of the equity of the children of Goodwynne, because the children resided on the land in dispute from the time of their birth up to the time of their majority. This, we think, was not sufficient to put the purchaser upon notice as to any equity they might have had in the land. The father held the legal title. He was in possession and control of the property. The fact that his children resided with him and that he had informed them that they had an interest in the land was not sufficient to affect Bellerby with notice or to put him upon inquiry. Bellerby knew that the father had the legal title, and that he was in possession and control of the premises. In the absence of any notice of the children's rights, he could deal with the father alone without making any inquiry as to the rights of any one else in the land. But it was further said that one of the children, after arriving at age and having resided for some time upon other lands of the father, had, in the latter part of December, 1890, a few days before the deed was made by Goodwynne to Bellerby, returned to the land and claimed his right as tenant in common, and his father had assigned him a farm upon the land. This is relied upon as notice to Bellerby. The affidavit of this son shows that he returned to the place late in December, 1890, and began to cultivate the land a few days after Christmas, but it does not appear whether he returned to the house and home of his father and resided there or whether he lived in a separate dwelling. It does not appear that there was time for Bellerby to have had any notice of his having moved back upon the land, it not even appearing that he began to cultivate the land prior to the date of the loan. Nearly all of the life of this son had been spent upon this place, and his return and cultivation of the land after Christmas, 1890, was perfectly consistent with his previous residence there, and was not such a change of residence or control as to show a claim adverse to the father. The father had the legal title, and the son had once lived on the place with the father, and in his moving back there was nothing to put the public on notice that he went in any capacity other than as a member of his father's

family, holding under and with the consent of the head of the family. His possession might well have been subordinate to that of the father, the latter holding the land and, as head of the family, allowing the son to cultivate a part of the land under him. Moreover, the record demonstrates that the father remained in possession and control of the land, returning it for taxes in his own name, up to the first of January, 1902, when he surrendered it under an agreement with Bellerby. During most of the time from 1900 to 1902 these claimants, having married, were living on other lands. So far as this record discloses they never gave to the public any notice or intimation that they claimed any interest in the land.

6, 7, 8. The remaining headnotes announce no new principles, and are sufficiently full to show their application to the case.

*Judgment affirmed. All the Justices concurring, except Lumpkin, P. J., absent.*